Patrick R. Day, P.C.
Thomas L. Sansonetti, P.C.
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY 82003-1347
Telephone: (307) 778-4200
Facsimile: (307) 778-8175

Geraldine A. Brimmer
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Telephone: (303) 473-2700
Facsimile: (303) 473-2720

Buck S. Beltzer
Teresa D. Locke
HOLLAND & HART LLP
P. O. Box 8749
Denver, CO 80201-8749
Telephone: (303) 295-8000
Facsimile: (303) 295-8261

Lynn C. Hart
Sinclair Oil Corporation
550 E. South Temple
Salt Lake City, UT 84102
Telephone: (801) 524-2756
Facsimile: (801) 524-2880

ATTORNEYS FOR PLAINTIFF

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| SINCLAIR WYOMING REFINING COMPANY, a Wyoming corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 12-CV-196-J |
| PRO-INSPECT, INC. (d/b/a MOODY INTERNATIONAL ASSET INTEGRITY SERVICES, INC.), a Texas corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF SINCLAIR'S TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. THE CORE LEGAL DISPUTES ...........................................................................1

III. API 570—THE PIPING INSPECTION STANDARD OF CARE ........................3

IV. BREACH OF CONTRACT ....................................................................................4

    A. Pro-Inspect Failed to Meet Express Contract Provisions...............................4

    B. Pro-Inspect's Breach of Contract Entitles Sinclair to Damages. ...................6

        1. Sinclair Suffered Direct Property Damages for the Repair Costs of the 583 Unit. .................................................................................................7

        2. Sinclair Suffered Consequential Damages in the Form of Foreseeable Lost Profits.............................................................................................7

V. NEGLIGENCE........................................................................................................9

    A. Pro-Inspect Owed Sinclair a Tort Duty of Care to Conduct a Competent API 570-Certified Inspection...........................................................................9

        1. *Gates* Test for Independent Duty of Care.............................................10

        2. The Court Should Only Apply the Test from *Gates*............................12

    B. Pro-Inspect Breached Its Duty of Care to Conduct a Competent API 570-Certified Inspection. ..................................................................................14

    C. Pro-Inspect's Breach of Its Duty of Care Proximately Caused Sinclair's Injuries. ..........................................................................................................14

    D. Pro-Inspect's Breach of Duty Entitles Sinclair to Damages. ........................15

    E. Sinclair Satisfied its Duty to Mitigate Damages. ..........................................15

VI. APPLICABLE LAW ON PRO-INSPECT'S DEFENSES ...................................17

    A. Sinclair May Hold Pro-Inspect Liable Regardless of Sinclair's Regulatory Duties to OSHA. ...........................................................................................17

    B. Pro-Inspect's Status as an Independent Contractor and Certified Professional Defeats Its Arguments Regarding Sinclair's Alleged Lack of Oversight and Control. ..........................................................................................................19

    C. Pro-Inspect Remains Liable for Its Own Conduct Regardless of Sinclair's Alleged Failings. ...........................................................................................20

VII. THE COURT'S COMBINED ANALYSIS .........................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Air Prods. and Chemicals, Inc. v. Eaton Metal Prods. Co.*,
   272 F. Supp. 2d 482 (E.D. Pa. 2003) ...........................................................................9, 12, 13

*City of New Orleans, Through New Orleans Aviation Bd. v. Vicon, Inc.*,
   529 F. Supp. 1234 (E.D. La. 1982) ......................................................................................18

*Dakota Gasification Co. v. Pacoe Bldg Sys.*,
   91 F.3d 1094 (8th Cir. 1996) ...............................................................................................12

*Dale K. Barker Co., P.C. v. Valley Plaza*,
   541 F. App'x 810 (10th Cir. 2013) .......................................................................................18

*Detroit Edison Co. v. NABCO, Inc.*,
   35 F.3d 236 (6th Cir. 1994) .................................................................................................12

*Dunbar v. Jackson Hole Mountain Resort Corp.*,
   392 F.3d 1145 (10th Cir. 2004) ...........................................................................................12

*Hjelle v. Mid-State Consultants, Inc.*,
   394 F.3d 873 (10th Cir. 2005) .............................................................................................19

*Hull v. Chevron U.S.A., Inc.*,
   812 F.2d 590 (10th Cir. 1987) .............................................................................................18

*McGriff v. Gramercy Capital Corp.*,
   2013 WL 1963801 (E.D. Va. May 9, 2013) .........................................................................18

*Mem'l Hosp. of Laramie Cnty. v. Healthcare Realty Trust Inc.*,
   509 F.3d 1225 (10th Cir. 2007) ...........................................................................................13

*OCI Wyoming, L.P. v. Pacificorp*,
   2005 WL 5985388 (D. Wyo. 2005) ........................................................................................8

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
   499 F.3d 1151 (10th Cir. 2007) .............................................................................................7

*St. Paul Companies v. Constr. Mgmt. Co., Ltd.*,
   96 F. Supp. 2d 1094 (D. Mont. 2000) ..................................................................................18

*Wood v. Eli Lilly & Co.*,
   38 F.3d 510 (10th Cir. 1994) ...............................................................................................12

## S<small>TATE</small> C<small>ASES</small>

*Action Ads, Inc. v. Judes*,
    671 P.2d 309 (Wyo. 1983)........................................................................................................7

*Bettencourt v. Pride Well Service, Inc.*,
    735 P.2d 722 (Wyo.1987).......................................................................................................15

*Brubaker v. Glenrock Lodge Int'l Order of Odd Fellows*,
    526 P.2d 52 (Wyo. 1974).................................................................................................10, 13

*BRW, Inc. v. Dufficy & Sons, Inc.*,
    99 P.3d 66 (Colo. 2004).........................................................................................................13

*Cities Serv. Co. v. Northern Prod. Co.*,
    705 P.2d 321 (Wyo. 1985)......................................................................................................18

*Claman v. Popp*,
    2012 WY 92, 279 P.3d 1003 (Wyo. 2012) ..............................................................................5

*Cline v. Sawyer*,
    600 P.2d 725 (Wyo. 1979)......................................................................................................10

*Coop. Power Ass'n v. Westinghouse Elec. Corp.*,
    493 N.W.2d 661 (N.D. 1992) .................................................................................................12

*Cosmopolitan Homes, Inc. v. Weller*,
    663 P.2d 1041 (Colo. 1983)...................................................................................................13

*Duke v. Housen*,
    589 P.2d 334 (Wyo. 1979).......................................................................................................7

*Duncan v. Afton, Inc.*,
    991 P.2d 739 (Wyo. 1999)......................................................................................................10

*Erpelding v. Lisek*,
    2003 WY 80, 71 P.3d 754 (Wyo. 2003) .................................................................................10

*Excel Constr., Inc. v. HKM Eng'g, Inc.*,
    2010 WY 34, 228 P.3d 40 (Wyo. 2010) ...........................................................................12, 13

*Foote v. Simek*,
    2006 WY 96, 139 P.3d 455 (Wyo. 2006) ...............................................................................14

*Franks v. Indep. Prod. Co., Inc.*,
    2004 WY 97, 96 P.3d 484 (Wyo. 2004) .................................................................................19

*Gates v. Richardson*,
    719 P.2d 193 (Wyo. 1986).............................................................................................10, 12, 13

*Gorski v. Smith*,
    812 A.2d 683 (Pa. Super. Ct. 2002)......................................................................13

*Hatton v. Energy Elec. Co.*,
    2006 WY 151, 148 P.3d 8 (Wyo. 2006) ...............................................................9

*Herling v. Wyoming Machinery Co.*,
    2013 WY 82, 304 P.3d 951 (Wyo. 2013) ..............................................................7

*Hines v. Sweeney*,
    201 P. 1018 (Wyo. 1921)....................................................................................15

*Horn v. Wooster*,
    2007 WY 120, 165 P.3d 69 (Wyo. 2007) ..............................................................6

*JBC of Wyoming Corp. v. City of Cheyenne*,
    843 P.2d 1190 (Wyo. 1992)........................................................................7, 12, 13

*JK ex rel. DK v. MK*,
    5 P.3d 782 (Wyo. 2000)......................................................................................13

*Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Eng'rs, Inc.*,
    843 P.2d 1178 (Wyo. 1992)................................................................................11

*Kerbs v. Walck*,
    2010 WY 53, 229 P.3d 974 (Wyo. 2010) ............................................................15

*Koken v. Steinberg*,
    825 A.2d 723 (Pa. Commw. Ct. 2003) ...............................................................13

*Kruckenberg v. Ding Masters, Inc.*,
    2008 WY 40, 180 P.3d 895 (Wyo. 2008) ............................................................19

*Lynch v. Norton Constr., Inc.*,
    861 P.2d 1095 (Wyo.1993)................................................................................15

*M & M Auto Outlet v. Hill Inv. Corp.*,
    2010 WY 56, 230 P.3d 1099 (Wyo. 2010) .....................................................15, 16

*Metro. Gas Repair Serv., Inc. v. Kulik*,
    621 P.2d 313 (Colo. 1980).................................................................................13

*Natural Gas Processing Co. v. Hull*,
    886 P.2d 1181 (Wyo.1994)............................................................................15, 19

*Neibarger v. Universal Coops., Inc.*,
    486 N.W.2d 612 (Mich. 1992)...........................................................................12

*Noonan v. Texaco, Inc.*,
713 P.2d 160 (Wyo. 1986)..................................................................................19

*Rapidigm, Inc. v. ATM Mgmt. Serv., LLC*,
63 Pa. D. & C. 4th 234 (Pa. Ct. Com. Pl. 2003) ..................................................13

*Rawlinson v. Greer*,
2003 WY 28, 64 P.3d 120 (Wyo. 2003) ...............................................................10

*Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*,
929 P.2d 1228 (Wyo. 1996)..................................................................................12

*Schlinger v. McGee*,
2012 WY 7, 268 P.3d 264 (Wyo. 2012) .................................................................5

*Schuler v. Cmty. First Nat'l Bank*,
999 P.2d 1303 (Wyo. 2000)..................................................................................13

*Singer v. New Tech Eng'g L.P.*,
2010 WY 31, 227 P.3d 305 (Wyo. 2010) .............................................................19

*Stephenson v. Pacific Power & Light Co.*,
779 P.2d 1169 (Wyo. 1989)..................................................................................15

*Strong Constr., Inc. v. City of Torrington*,
2011 WY 82, 255 P.3d 903 (Wyo. 2011) ...............................................................9

*Tavares v. Horstman*,
542 P.2d 1275 (Wyo. 1975)..................................................................................10

*Throckmartin v. Century 21 Top Realty*,
2010 WY 23, 226 P.3d 793 (Wyo. 2010) ...............................................15, 16, 19

*Town of Alma v. AZCO Const., Inc.*,
10 P.3d 1256 (Colo. 2000)....................................................................................13

*Winter v. Pleasant*,
2010 WY 4, 222 P.3d 828 (Wyo. 2010) ............................................................5, 17

*WSP, Inc. v. Wyoming Steel Fabricators and Erectors, Inc.*,
2007 WY 80, 158 P.3d 651 (Wyo. 2007) ...............................................................8

## STATE STATUTES

Wyo. Stat. Ann. § 1-1-109(b) ...............................................................................15

## REGULATIONS

29 C.F.R. § 1910.119 ..................................................................................11, 14, 17

29 C.F.R. § 1910.119(h) ...........................................................................................................17

29 C.F.R. § 1910.119(j)(4)(i), (ii).............................................................................................17

29 C.F.R. § 1910.119(j)(4)(iv)..................................................................................................17

### OTHER AUTHORITIES

41 Am. Jur. 2d Independent Contractors § 61 ...........................................................................18

http://www.morelaw.com/verdicts/case.asp?n=03+L+9812&s=IL&d=32241 ...............................7

http://www.sfgate.com/business/article/Billions-more-in-Chevron-profit-
    Earnings-jump-2598837.php ................................................................................................7

Plaintiff Sinclair Wyoming Refining Company (Sinclair) respectfully submits this Trial Brief pursuant to the Court's Order on Initial Pretrial Conference:

## I.      INTRODUCTION

Defendant Pro-Inspect, Inc. provides piping inspection services to refineries using employees certified in refinery piping inspection by the American Petroleum Institute (API). The API has promulgated specific and detailed Codes that governing piping inspections and these Codes are used by OSHA as the standard which must be met by refineries and third party inspectors when inspecting process piping. These Codes include API 570, API 571, and API 574. All of the witnesses and experts agree that inspectors certified under these Codes are required to know, and to follow, these Codes when inspecting process piping.

As part of its mechanical integrity program, Sinclair hired Pro-Inspect in 2010 to supply an API 570-certified inspector to inspect the piping circuits of its crude oil 581 and583 processing Units. Sinclair paid Pro-Inspect more than $3 million dollars under this contract. Unfortunately, Pro-Inspect's certified inspector failed to follow the applicable Codes and failed to implement Sinclair's requested inspection. Pro-Inspect breached its most basic duties under the Contract and the Codes, including failure to notify Sinclair that a critical portion of its piping was thin, failure to calculate corrosion rates, failure to properly classify the pipe and identify the consequences of its failure, and Pro-Inspect failed to place and then measure pipe thickness at the proper number of corrosion monitoring locations (CMLs) on the circuit. As a result, Pro-Inspect missed paper thin pipe in a vertical section of two-inch pipe in the refinery's vacuum tower slop oil line, which ruptured and sprayed hot hydrocarbons toward an adjacent two-story heater. The resulting fire destroyed parts of Sinclair's 583 vacuum tower and associated equipment and shut the 581 and 583 Units down for the better part of two months, causing Sinclair to suffer approximately $88.72 million in property and business interruption damages. Sinclair seeks to recover those damages through this litigation based on two causes of action: breach of contract and negligence.

## II.     THE CORE LEGAL DISPUTES

Throughout the hundreds of pages of pleadings in this case, Pro-Inspect does not—and cannot—defend its inspection as compliant with the API Codes. Its own experts have acknowledged that the inspection was flawed. Instead, Pro-Inspect seeks to shift the blame for its flawed inspection onto Sinclair by arguing: (1) Pro-Inspect was only obligated to do what

Sinclair's J.R. Eggleston instructed it to do and no more—regardless of what the API Code provides; and (2) its employee, Joshua Kiss, was merely a hired hand, not responsible for exercising independent thinking, taking initiative, or applying his professional judgment in the field—irrespective of what the Code instructs. As discussed throughout this Trial Brief, Wyoming law, the contract, and the facts do not support Pro-Inspect's defenses. Indeed, Pro-Inspect's own 30(b)(6) corporate representative testified to the contrary.

Nevertheless, according to Pro-Inspect's latest set of arguments, because Mr. Eggleston did not expressly tell Pro-Inspect's project lead Mike Fitzpatrick that Pro-Inspect's API 570-certified inspector (Mr. Kiss) was to calculate a corrosion rate using ultrasonic testing (UT) data and UT data taken by TechCorr to insert on the CML form that Sinclair provided, or to follow all of the provisions of the API Code applicable to "authorized piping inspectors," Mr. Kiss was not contractually obligated to do so and was free to ignore thin pipe readings found by the technicians working on the Circuit with him. This despite the Code's command that certified inspectors "shall" review all UT readings taken by the technicians. API 570 §§ 3.1.36, 4.3.4.

As will be demonstrated at trial, Pro-Inspect's argument contradicts the contract's terms, conflicts with Section 4.3.4 of the API Code, and relies on the false premise that Pro-Inspect merely runs a "body shop," providing unskilled laborers rather than certified inspectors. Mr. Eggleston's discussions with Mr. Fitzpatrick regarding the scope of the work was based on the understanding that Mr. Fitzpatrick was himself a certified professional knowledgeable of the API Code's provisions, capable of complying with the Code, and fully aware that direction to do a "full API 570 Inspection" meant just that. Mr. Eggleston had robust conversations with Mr. Fitzpatrick on the scope of the work, including conversations on placing CML locations, reviewing CML data, and referring to API 571 to obtain corrosion rates where preexisting data did not exist. Mr. Eggleston then collaborated with Mr. Fitzpatrick to create the CML calculation form that Pro-Inspect should have used during the inspection. But the evidence will show that Pro-Inspect did not use this form correctly.

Had Pro-Inspect done what was requested under the Contract and followed the API Codes, the explosion and fire in the 583 unit would not have occurred. Ray Hansen, Sinclair's operations manager, will testify from his extensive national refinery experience that Pro-Inspect should have reported the thin pipe found by the technicians because Sinclair could have replaced the circuit without affecting production. But Pro-Inspect did not inform Sinclair of the thin pipe

because it failed to abide by the terms of the Contract and API 570, by its own admission ignoring the data revealing thin pipe in the very inspection file its inspector was using. Dr. Robert Caligiuri—principal engineer of a world-renowned consulting firm that deals with metallurgical inspections—will testify that Pro-Inspect repeatedly failed to follow the Code, causing it to miss the thin pipe and allowing the fire to occur.

In response to Sinclair's negligence claim, Pro-Inspect argues that it owes Sinclair no independent tort duties. According to Pro-Inspect, its only obligation was to provide Sinclair with a hired hand, such that Sinclair, as the refinery owner, is vicariously chargeable with Pro-Inspect's failed inspection.

But this argument is legally fallacious and contravenes Sinclair's reason for requiring Pro-Inspect to assign an API 570-certified inspector to this project. API 570-certified inspectors have duties and obligations mandated by the Code, irrespective of the underlying detail that the parties' contract provides. For the substantial fee it paid to Pro-Inspect, Sinclair expected that Pro-Inspect's employee would perform to the standards of a certified technical professional trained to make evaluative judgments in the field about the condition of piping (as required by API 570), to take ownership of the inspection of each and every circuit by directing the project team lead, to include technicians from TechCorr (as required by API 570), and to report directly to the Sinclair, as the refinery owner, any problems or concerns found (as required by API 570). This is what Wyoming law and public policy require.

## III.    API 570—THE PIPING INSPECTION STANDARD OF CARE

To resolve the core dispute in this case—are Pro-Inspect's inspectors to be treated as certified professionals hired to promote safety and regulatory compliance, or are they merely hired hands, free to ignore Code provisions unless specifically instructed to the contrary—one must understand the importance, the purpose and the basic provisions of API 570. API 570 was developed in the mid-1990s by the refining industry to set forth standard engineering practices to govern inspection services for process piping systems. API 570 is employed by Wyoming's OSHA as the standard for piping inspection practices required by its regulations. Indeed, all of the experts in this case agree that API 570 establishes the "Recognized and Generally Accepted Good Engineering Practices" (RAGAGEP) applicable to processing piping inspection services. The Code expresses the good engineering practices a reasonably competent inspection service company must follow in the exercise of ordinary care under tort law.

Section 3.1.6 of API 570 defines the term "authorized inspection agency" as "an independent inspection organization licensed or recognized by the jurisdiction in which the piping system is used and employed by or under contract to the owner or user." Pro-Inspect fits this definition and is an authorized inspection agency. That is its business model. In turn, Section 3.1.7 of API 570 defines an "authorized piping inspector" as "[a]n employee of an authorized inspection agency who is qualified and certified to perform the functions specified in API 570. An [Nondestructive Examination] examiner is not required to be an authorized piping inspector. Whenever the term inspector is used in API 570, it refers to an authorized piping inspector." Mr. Kiss fits this definition and was therefore an authorized piping inspector when working at Sinclair, and subject to the Code requirements applicable to an authorized piping inspector.

As an authorized piping inspector, the Code spells out Mr. Kiss's responsibilities very clearly. Section 4.3.4 of API 570 provides that when inspections "are being conducted on piping systems"—what Kiss was hired to do—"an authorized piping inspector shall be responsible to the owner/user for determining that the requirements of API 570 on inspection, examination, quality assurance and testing are met." API 570 § 4.3.4. The Code further instructs that the authorized piping inspector is responsible for "extending the scope of the inspection (with appropriate consultation with engineers/specialists), where justified depending upon the findings of the inspection. Where nonconformances are discovered, the inspector is responsible for notifying the owner/user in a timely manner and making appropriate repair or other mitigative recommendations." *Id.* While the authorized piping inspector may be assisted in inspections "by other properly trained and qualified individuals, who may or may not be certified piping inspectors" (in this case the TechCorr technicians Russ Hulsey and Juan Malave), the Code requires that "all examination results shall be evaluated and accepted by the authorized piping inspector." *Id.* Given these provisions, Sinclair was justified in its expectation that Mr. Kiss, as an authorized piping inspector, would perform his work to the standards of a certified technical professional whether or not he was expressly requested to do so.

## IV.   BREACH OF CONTRACT

### A.   Pro-Inspect Failed to Meet Express Contract Provisions.

Pro-Inspect breached its contract with Sinclair by failing to provide a competent API 570-certified inspection. "The elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised

therein, and entitlement of injured party to damages." *Schlinger v. McGee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012) (citations omitted). "[E]ach provision in a contract has a purpose" and this Court must "avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless. *Claman v. Popp*, 2012 WY 92, ¶ 28, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). A party is liable for breach of contract when it fails to comply with standards contained in an external manual incorporated into the contract by reference. *See Winter v. Pleasant*, 2010 WY 4, ¶ 16, 222 P.3d 828, 835-36 (Wyo. 2010). This is especially true when an external manual or guide defines what constitutes the "good and workmanlike manner" standard. *See id.*

Pro-Inspect breached the following provisions in the Sinclair/Pro-Inspect contract:

1. Pro-Inspect "shall provide API Certified Inspectors [and] NDE Techs to access [sic] piping and vessels as directed by Sinclair." Pro-Inspect did not perform as directed.

2. Pro-Inspect "shall perform the Work diligently and carefully in a good and workmanlike manner according to accepted standards of construction . . . ." Pro-Inspect breached many of the applicable standards for piping inspections.

3. Pro-Inspect "shall comply, and shall cause its employees, agents and other involved in the performance of this Agreement . . . to comply with all applicable laws, ordinances, rules, regulations and orders of any federal, state or local government . . . which are applicable to this Agreement, including all health and safety laws, ordinances, rules, regulations and orders . . . ." Pro-Inspect ignored and breached the API code provisions enforced as law by OSHA.

4. Pro-Inspect "is an independent contractor and, as such, has full power and authority to select the means, methods and manner of performing the Work, being responsible to Company for all materials delivered and for the results contracted for." Pro-Inspect now argues it was not an independent contractor and did not act as such.

Wyoming's OSHA evaluates piping inspections based on API 570 because it is the accepted standard of the piping inspection industry. Mr. Kiss failed to "diligently and carefully" perform an API 570 inspection. Sinclair will show he failed to calculate the correct number of CMLs and comply with other key API 570 provisions. Mr. Kiss violated Sinclair's directions, failed to properly employ the CML calculator form Sinclair directed to be used, and violated the piping inspection industry's accepted standards. Sinclair did not receive the services for which it paid and contracted.

**B.      Pro-Inspect's Breach of Contract Entitles Sinclair to Damages.**

The evidence will show that Pro-Inspect's failed inspection caused $88.72 million in damages, under either Sinclair's tort or contract claim. *Horn v. Wooster*, 2007 WY 120, ¶ 13, 165 P.3d 69, 73 (Wyo. 2007) (explaining that the tort damages for business losses can be similar to damages for breach of contract). Although Sinclair's tort and contract claims arise from the same facts, the legal analysis to fix damages for each claim is somewhat different. As a result, the Court could fix different damages amounts or award damages under one claim and not the other.

But the existence of both tort and contract claims does not preclude fixing damages for both; the procedures for doing so and arriving at a final judgment are set forth below.[1] Pro-Inspect failed to perform its inspection properly and left thin pipe in operation which eventually burst, igniting petrochemicals in the pipe. The fire damaged the 583 unit so badly that Sinclair had to abruptly shut it and all other related units down to put out the fire and, starting almost immediately, repair the fire damage. The evidence will show Sinclair worked quickly to repair the unit. And through its best efforts, Sinclair repaired the unit, started up the refinery, and achieved a reasonable crude throughput rate on October 18, 2011.

The abrupt "crash-down" required after the fire on September 1, 2011, cooled the units from 600-750 degrees to ambient temperature in a matter of hours, not days, causing additional damage. This rapid cooling caused "thermal shock," rapidly contracting the metal in the units and dislodging coke that had accumulated and attached to the metal over time. The dislodged coke traveled into the liquid stream, building up during October's re-start to such an extent that it plugged the piping below the vacuum tower, inhibiting the processed crude flow and forcing Sinclair to shut down on October 20, 2011 for six days to clear the lines. After another re-start, the crude unit returned to full production by the end of October.

During the shutdown, Sinclair spent $7.51 million in property damages repair costs and spent several months returning the units to full production, costing Sinclair an additional $81.72 million in lost profits. These amounts are not out of the ordinary for a refinery fire. In similar cases, refining companies in other lawsuits have recovered hundreds of millions of dollars. For example, in the early 2000s, a burst pipe fitting in a Citgo refinery resulted in $387.4 million in

---

[1] The law relevant to Sinclair's tort damages appears with Sinclair's discussion of negligence.

damages even after the jury applied comparative fault principles.[2] Similarly, a fire in a Chevron refinery resulted in over $150 million in damages for repairs and lost profits.[3] Sinclair's damages are therefore in line with the losses other refineries in the industry have suffered from burst pipes and fires, all foreseeable consequences of a failed inspection in a petroleum refinery.

The damages awarded for Pro-Inspect's breach of contract should put Sinclair in the same position it would have occupied had Pro-Inspect performed under the contract. *JBC of Wyoming Corp. v. City of Cheyenne*, 843 P.2d 1190, 1195 (Wyo. 1992). To put Sinclair in this position, the Court should award Sinclair both direct and consequential damages. *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (defining direct damages); *Duke v. Housen*, 589 P.2d 334, 345 (Wyo. 1979) (defining consequential damages).

## 1. Sinclair Suffered Direct Property Damages for the Repair Costs of the 583 Unit.

The fire caused by Pro-Inspect's failed inspection required $7.51 million in extensive repairs to the piping in the 583 unit and the HT 104 heater. That repair and re-start took a workforce of sixty to seventy contractors executing more than a hundred work orders over the course of about a month. And the re-start progressed deliberately, which is required to ensure safe operations after an emergency crash.

## 2. Sinclair Suffered Consequential Damages in the Form of Foreseeable Lost Profits.

Sinclair can recover consequential damages if the damages are the foreseeable result of the breach of contract. *Action Ads, Inc. v. Judes*, 671 P.2d 309, 316 (Wyo. 1983). Damages are foreseeable "either because they were a natural result or because they were a contemplated result of the breach." *Id.* (citation omitted). Foreseeable damages do not need to be obvious; they need only to be part of the natural chain of events that could occur because of a breach. *Id.* Sinclair's lost profits during the downtime for repair and re-start and the October shutdown and restart due to thermal shock were foreseeable consequences.[4]

---

[2] http://www.morelaw.com/verdicts/case.asp?n=03+L+9812&s=IL&d=32241, attached as Ex. 1.

[3] http://www.sfgate.com/business/article/Billions-more-in-Chevron-profit-Earnings-jump-2598837.php, attached as Ex. 2.

[4] The contract's silence on consequential damages does not matter because Wyoming law does not consider silence to have any meaning. *Herling v. Wyoming Machinery Co.*, 2013 WY 82, ¶ 35, 304 P.3d 951, 960 (Wyo. 2013) (explaining courts "will exercise great caution not to include in the contract, by construction, something which was intended to be excluded.")

Pro-Inspect could foresee from the start of the contract that if it failed to identify paper-thin pipe Sinclair could lose profits from any resulting failures in that pipe. All of the witnesses agree that large explosions and fires are the foreseeable consequence of a burst pipe in a refinery, which is the very reason why the piping inspection services industry exists. Sinclair's October shutdown to clear the coke that sloughed from the unit and pipe during the thermal shock is also foreseeable. Pro-Inspect's expert, Regan Howell, agreed that quick shutdowns, like the one that occurred after the fire in the 583 unit, can cause thermal shock and result in coke dislodging from the interior of the metal unit. And it is foreseeable that the dislodged coke could collect and impede flow in the pipe. Had the fire not forced an abrupt shutdown of the 583 unit, the coke would have remained attached to the metal unit—just as it had been for years before the fire.[5] The foreseeability of these damages means that Sinclair need prove only the value of its lost profits.[6]

To prove lost profits, Sinclair will show at trial that: (1) net profits were lost; (2) the amount of those profits can be determined with a reasonable degree of certainty; and (3) Pro-Inspect's breach was the proximate cause of the lost profits. *WSP, Inc. v. Wyoming Steel Fabricators and Erectors, Inc.*, 2007 WY 80, ¶ 20, 158 P.3d 651, 655 (Wyo. 2007). To start, Sinclair's refinery is "production limited," which means that Sinclair sells the entire product it creates when it produces that product. This distinguishes this case from *OCI Wyoming, L.P. v. Pacificorp*[7] because Sinclair does not have the tankage to stockpile the two million barrels that the botched inspection and fire prevented Sinclair from refining. If Sinclair's production declines, as it did, then so does the amount it sells and the profits it would make from those sales. *See WSP, Inc.*, ¶ 20. The lost production during the time Sinclair's 583 unit was down totaled two million barrels, which then cost Sinclair the $42 per barrel profit.

Sinclair's damages expert, Kevin Waguespack of Baker & O'Brien Inc., used well-accepted industry methods and practices for determining the economic losses that Sinclair

---

[5] And the coke would not have attached to the unraveled wire gasket, which was also inside the pipe for years of successful and high-rate processing. Pro-Inspect argues the wire gasket caused the pluggage, but the evidence will show that the wire gasket had no impact on flow until the thermal shock caused by the fire and botched inspection.

[6] Pro-Inspect may contend that neither it nor Sinclair contemplated these damages in the contract both signed in 2010. This is a red herring. *See* Sinclair's Motion in Limine to Exclude Terms from the Unsigned and Irrelevant 2011 Contract Form. Pro-Inspect would have to rely on an unsigned form contract to show that it and Sinclair did not want consequential damages. But that contract never governed Sinclair and Pro-Inspect's relationship.

[7] 2005 WL 5985388 (D. Wyo. 2005), attached as Ex. 3. Unlike Sinclair, OCI failed to produce evidence that its stored product could not cover the production lost during an interruption in production.

suffered. Baker & O'Brien measured the losses by: (1) determining the volume of throughput lost because of the fire; (2) determining the appropriate crude oil and refined products pricing during the time period of the loss; (3) calculating the gross margin; (4) determining the applicable variable costs that would have been required to generate the gross margin during the loss period, which were avoided when the unit was down; and (5) calculating the economic loss by subtracting variable costs from gross margin. In conducting this analysis, Baker & O'Brien took into account Sinclair's previously planned outages and shut downs in other units. Using this methodology—a method with which Pro-Inspect's experts agree—Waguespack determined to a reasonable degree of certainty that Sinclair suffered $81.21 million in lost profits.

When deciding the amount of these lost profits and other contract damages, the Court should not apply comparative fault principles. *Strong Constr., Inc. v. City of Torrington*, 2011 WY 82, ¶ 25, 255 P.3d 903, 912-13 (Wyo. 2011). Contract damages are all-or-nothing; if Sinclair proves that Pro-Inspect breached the contract, then it should recover all foreseeable direct and consequential damages. *Id.* Comparative fault does not apply, and Sinclair can recover its full damages.

## V.     NEGLIGENCE

Pro-Inspect also owed Sinclair an independent tort duty to exercise reasonable care in performing its inspection according to API 570's provisions. This duty should be imposed as a matter of law, independent of Pro-Inspect's contractual obligations.

Under Wyoming law, negligence occurs when: (1) the defendant owed the plaintiff a duty to conform to a specific standard of care; (2) the defendant breached the duty of care; (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff; and (4) the injury sustained by the plaintiff is compensable by money damages. *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 10, 148 P.3d 8, 13 (Wyo. 2006) (citations omitted). At trial, Sinclair will demonstrate Pro-Inspect's conduct constitutes negligence.

### A.     Pro-Inspect Owed Sinclair a Tort Duty of Care to Conduct a Competent API 570-Certified Inspection.

API 570 imposes an independent duty of care on Pro-Inspect, an authorized inspection agency, because of the Code's important role in public safety. Standards developed by industry organizations often dictate the standard of care for negligence. *See Air Prods. and Chemicals, Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 493 (E.D. Pa. 2003) (noting an independent

duty exists under Utah law for a certified entity offering inspection services based on industry code); *Rawlinson v. Greer*, 2003 WY 28, ¶ 17, 64 P.3d 120, 124 (Wyo. 2003) (noting licensed or certified professionals that fail to comply with the accepted standards in their field or the standards society is willing to recognize as acceptable may be subject to negligence actions). In addition to liability in contract, allowing liability based on a tort duty ensures the protection of the public at large by requiring compliance with the API Code in all inspections. *See, e.g., Cline v. Sawyer*, 600 P.2d 725, 732 (Wyo. 1979); *Tavares v. Horstman*, 542 P.2d 1275, 1279 (Wyo. 1975); *Brubaker v. Glenrock Lodge Int'l Order of Odd Fellows*, 526 P.2d 52, 58-59 (Wyo. 1974). Pro-Inspect asserts it is not responsible for following API 570's requirements for authorized piping inspectors unless a contract for API 570-certified inspection services specifies particular provisions that must be followed. This position is contrary to the purpose and structure of API 570. Consequently, Pro-Inspect's attempt to deny its independent duty of care under API 570 fails as a matter of law and fact.

### 1.    *Gates* Test for Independent Duty of Care.

The eight-factor *Gates* test used by Wyoming courts indicates Pro-Inspect owes an independent duty of care under API 570 to Sinclair. *See Gates v. Richardson*, 719 P.2d 193 (Wyo. 1986).[8] The eight factors outlined in the *Gates* test are: (1) the foreseeability of harm to the plaintiff; (2) the closeness of the connection between the defendant's conduct and the injury suffered; (3) the degree of certainty that the plaintiff suffered injury; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden upon the defendant; (7) the consequences to the community and the court system; and (8) the availability, cost, and prevalence of insurance for the risk involved. *Id.* at 196.

Applying the *Gates* test to this case, Pro-Inspect owes Sinclair an independent duty of care. **First**, Pro-Inspect's failed inspection foreseeably caused Sinclair's property damage. API 570 inspections are designed to find corroded or thin pipe before it ruptures. If refinery piping ruptures, it frequently causes fire, explosion, and severe injury. Sinclair's damages were foreseeable because Pro-Inspect would have found the thin pipe had it performed a competent inspection.

---

[8] Although the eight-factor test adopted in *Gates* has been used to recognize new common law tort claims, it has also been used to find whether a tort duty exists (or should be imposed) as well. *See Erpelding v. Lisek*, 2003 WY 80, ¶ 18, 71 P.3d 754, 758 (Wyo. 2003); *see also Duncan v. Afton, Inc.*, 991 P.2d 739, 744 (Wyo. 1999) (applying the *Gates* factors to consider "whether a duty should be imposed based on a particular relationship").

**Second**, Pro-Inspect's negligent conduct directly caused Sinclair's injury. But for Pro-Inspect's inspection that missed the thin pipe, the pipe would have been replaced before it ruptured. Mr. Hansen will testify that Sinclair would have replaced the pipe had it known about the pipe's accelerated corrosion and high number of CMLs required under API 570. As an authorized piping inspector, Mr. Kiss was responsible under API 570 for examining the UT results, performing accurate corrosion calculations, and reporting and expanding its efforts if nonconformances were discovered. *See* API 570 § 4.3.4.

**Third**, Sinclair suffered $88.72 million in property damage and business interruption damages due to the refinery fire.

**Fourth**, the moral blame attached to Pro-Inspect's conduct is high. Health problems, severe injury, and death are common outcomes when a fire occurs at a refinery. 29 C.F.R. § 1910.119 and API 570 exist to improve process safety management so that refinery employees and passersby are not injured when a fire or explosion occurs. Pro-Inspect is morally blameworthy because it directly caused the pipe rupture by ignoring Code provisions drafted for the express purpose of protecting life and property. Pro-Inspect's failed inspection put a lot of other people at risk.

**Fifth**, the importance of preventing future harm is very high. The risk directly connected to a failed inspection may be catastrophic due to the high probability of injury, fire, explosion, and potential loss of human life. A failure by this Court to hold Pro-Inspect accountable for disregarding its obligations as an authorized inspection agency under API 570 signals that the industry-created safety standards are advisory and agencies offering inspection services are not accountable for their negligence.

**Sixth**, the extent of the burden placed on Pro-Inspect by finding it possesses a duty of care to Sinclair for complying with API 570's provisions is relatively low. As a negligence standard, API 570 only requires "the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals." *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Eng'rs, Inc.*, 843 P.2d 1178, 1186 (Wyo. 1992). The burden on Pro-Inspect is low because API 570 specifically defines inspectors' duties. Authorized piping inspectors are specially trained and certified, meaning they (ideally) perform competently with little difficulty. Additionally, inspectors are well-compensated for their work.

**Seventh**, the consequences to the community and the court system if this Court imposes a duty of care on Pro-Inspect are positive. The community benefits through increased accountability of authorized inspection agencies under API 570.

**Finally**, the availability, cost, and prevalence of insurance for the risk involved also weighs in Sinclair's favor. Insurance covers Pro-Inspect's professional malpractice, which is justified due to the nature of the services provided by the company. This coverage is common.

All of the *Gates* factors establish that Pro-Inspect owes Sinclair a duty of care. Therefore API 570 should constitute the specific standard of care which Pro-Inspect was obligated to uphold.

### 2.      The Court Should Only Apply the Test from *Gates*.

The Wyoming Supreme Court outlined the eight-factor *Gates* test to determine if a party owes an independent duty of care to another. This Court cannot supplant a Wyoming-specific test without committing reversible error. *See Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1148 (10th Cir. 2004) (citing *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994) ("[A]s a federal court sitting in diversity, we must ascertain the applicable Wyoming law as announced by the Wyoming Supreme Court so that the substantive law applied in federal court does not differ from what would apply in state court.")). Because Pro-Inspect's failed inspection caused $7.51 million in physical property damage to Sinclair's refinery, the Wyoming Supreme Court would recognize that Pro-Inspect owed Sinclair an independent tort duty to exercise reasonable care in the performance of its professional inspection duties separate from its contractual duties.[9] *See Air Prods.*, 272 F. Supp. 2d at 493; *Gates*, 719 P.2d at 196; *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 2010 WY 34, ¶ 25, 228 P.3d 40, 47 (Wyo. 2010) (citing *Rissler*, 929 P.2d at 1234 n.1, and *JBC*, 843 P.2d at 1197). As a result, the Court should not look to other rules for determining if an independent tort duty exists.

---

[9] Sinclair's property damage alone precludes the economic loss rule from applying in this case. *See Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1234-35 (Wyo. 1996) (holding the economic loss rule "bars recovery in tort when a plaintiff claims purely economic damages unaccompanied by physical injury to persons or property."). Pro-Inspect's argument that Sinclair did not suffer property loss fails as a matter of law. Pro-Inspect's "product" is professional inspection services, not the pipe that ruptured. So the cases it may rely on are distinguishable because the economic loss rule in those jurisdictions is expressly limited to product liability. *See Dakota Gasification Co. v. Pacoe Bldg Sys.*, 91 F.3d 1094, 1097-99 (8th Cir. 1996) (citing *Coop. Power Ass'n v. Westinghouse Elec. Corp.*, 493 N.W.2d 661, 666 (N.D. 1992) (rule applicable to machine manufacturers)); *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 240 (6th Cir. 1994) (citing *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 618 (Mich. 1992) (rule applicable to defective product purchased commercially)).

Even if the Court did look to other rules, like Colorado's rule for determining tort duties when a contract also exists, those rules would not bar Sinclair's claims. For example, the Colorado Supreme Court would most likely find Pro-Inspect owed Sinclair an independent tort duty. Colorado finds an independent duty of care based on three factors: (1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004). This is a professional services case, where both tort duties and contract duties typically coexist, including where a party negligently provided professional services related to safety inspections. *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1265-66 (Colo. 2000) (en banc); *Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 319 (Colo. 1980); *see also Air Prods.*, 272 F. Supp. 2d at 493; *Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1042, 1045 (Colo. 1983). API 570 imposes a common law duty of care in negligence on Pro-Inspect because its certified inspections are crucial to public safety and well-being. This would make the second and third factors weigh in favor of recognizing an independent tort duty as is common in professional services negligence cases.

Similarly, the Court would not apply the "gist of the action" doctrine.[10] As noted above, the Wyoming Supreme Court already established legal principles that govern. *Excel Constr.*, 2010 WY 34, ¶ 25 (allowing tort liability premised on a duty independent of contractual duties).[11] Further, an exception exists to the "gist of the action" doctrine that permits Sinclair's negligence cause of action to go forward. *See Rapidigm, Inc. v. ATM Mgmt. Serv., LLC*, 63 Pa. D. & C. 4th 234, 240 (Pa. Ct. Com. Pl. 2003) (citing *Gorski v. Smith*, 812 A.2d 683, 693-94 (Pa. Super. Ct. 2002), and *Koken v. Steinberg*, 825 A.2d 723, 730 (Pa. Commw. Ct. 2003) ("Nothing in our law insulates . . . professionals from being sued in contract for a failure to properly perform professional services" when a professional agrees "to provide that client with professional services consistent with those expected of the profession at large.")). At trial, Sinclair will show

---

[10] For a description and briefing on this doctrine, please see Dkt. 76 at 33-34.

[11] *See also Schuler v. Cmty. First Nat'l Bank*, 999 P.2d 1303, 1306 (Wyo. 2000); *JK ex rel. DK v. MK*, 5 P.3d 782, 792 n.2 (Wyo. 2000); *Gates*, 719 P.2d at 196; *see also Mem'l Hosp. of Laramie Cnty. v. Healthcare Realty Trust Inc.*, 509 F.3d 1225, 1235 (10th Cir. 2007) (applying Wyoming law to find that the tort claim was not based on the economic loss rule and that "Wyoming law does not forbid tort claims between contracting parties if tort liability is premised on a duty independent of contractual duties.") (citations omitted)); *JBC*, 843 P.2d at 1197 (acknowledging availability of tort recovery based on a contractual relationship with independent duties); *Brubaker*, 526 P.2d at 58-59 (allowing tort liability based on a contractual relationship).

Pro-Inspect owed Sinclair an independent duty in addition to its contractual duties. Allowing Pro-Inspect to ignore the API Code because Sinclair did not specifically spell out the Code's obligations would make a mockery of the reasons why the Code exists, and sanction sloppy inspections with dangerous results. In addition to the strong public policy and facts justifying an independent duty, Sinclair has cited overwhelming authority indicating Pro-Inspect did possess an independent duty to perform a competent inspection subject to API 570 and OSHA regulation 29 C.F.R. § 1910.119 requirements.

> **B.      Pro-Inspect Breached Its Duty of Care to Conduct a Competent API 570-Certified Inspection.**

Pro-Inspect failed to comply with the standard of care imposed by API 570 because its authorized piping inspector, Mr. Kiss, violated the Code's clear instruction that "an authorized piping inspector shall be responsible to the owner/user for determining that the requirements of API 570 on inspection, examination, quality assurance and testing are met." API 570 § 4.3.4. Sinclair will show Mr. Kiss's distinct failures at trial.

> **C.      Pro-Inspect's Breach of Its Duty of Care Proximately Caused Sinclair's Injuries.**

In order for proximate cause to exist, "the accident or injury must be the natural and probable consequence of the act of negligence." *Foote v. Simek*, 2006 WY 96, ¶ 22, 139 P.3d 455, 463 (Wyo. 2006). "The ultimate test of proximate cause is foreseeability of injury. In order to qualify as a legal cause, the conduct must be a substantial factor in bringing about the plaintiff's injuries." *Foote*, ¶ 22. Here, Pro-Inspect's conduct proximately caused Sinclair's property damage and economic loss in two ways.

First, a competent API 570 inspection would have revealed the real extent of the corrosion in Circuit 02-04-02. Had Mr. Kiss done his work correctly by using the existing data to calculate the corrosion rate and correctly classify the pipe as required by the Code, thirty-three more inspection locations, rather than only the thirteen locations Mr. Kiss utilized, might have been placed on the piping circuit for a total of forty-six CMLs, giving Pro-Inspect forty-six opportunities to find the paper-thin pipe. With forty-six CMLs on such a relatively small section of pipe, it is likely that the thin pipe that ultimately failed would have been discovered. Moreover, Mr. Hansen will testify that if Sinclair had been told that many more CMLs were needed on one circuit, it would have replaced the pipe immediately because such a large number of CMLs indicates a problem pipe.

Second, Mr. Kiss's failure to report the thin readings actually found by Mr. Malave, an employee of TechCorr, deprived Sinclair of the opportunity to consider replacing the circuit. Sinclair's Operations Manager at the time of the fire, Mr. Hansen, will testify that had Pro-Inspect informed Sinclair of thin readings, Sinclair would have replaced the circuit immediately, foreclosing the possibility that the circuit would have ruptured due to paper-thin pipe in September 2011.

### D. Pro-Inspect's Breach of Duty Entitles Sinclair to Damages.

Sinclair can recover tort damages for those losses proximately caused by Pro-Inspect's breach of duty. *Throckmartin v. Century 21 Top Realty*, 2010 WY 23, ¶ 19, 226 P.3d 793, 805 (Wyo. 2010).[12] As just explained, proximately caused damages are those that would be "the natural and probable consequence of the act of negligence." *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722, 726 (Wyo.1987); *Natural Gas Processing Co. v. Hull*, 886 P.2d 1181, 1186 (Wyo.1994); *Lynch v. Norton Constr., Inc.*, 861 P.2d 1095, 1099 (Wyo.1993). Unlike contract damages, Pro-Inspect does not have to foresee the type of damages; tort damages require only that Pro-Inspect's conduct could injure Sinclair. *Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169, 1178 (Wyo. 1989); *Hines v. Sweeney*, 201 P. 1018, 1020-21 (Wyo. 1921) (explaining that the injury does not have to be foreseen because that would lead to unjust results). As demonstrated above and in Sinclair's prior briefing, Pro-Inspect's botched inspection actually and proximately caused Sinclair $88.72 million in damages.

### E. Sinclair Satisfied its Duty to Mitigate Damages.

Sinclair had a duty to mitigate its damages. *M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 29, 230 P.3d 1099, 1109 (Wyo. 2010); *Kerbs v. Walck*, 2010 WY 53, ¶ 33, 229 P.3d 974, 981 (Wyo. 2010). For its breach of contract losses, Sinclair had to mitigate them unless mitigation would impose "undue risk, burden or humiliation." *M & M Auto Outlet*, 2010 WY at ¶ 29. For Sinclair's tort damages, it had to make "reasonable efforts" that "an ordinarily prudent man" would do under like circumstances to prevent further loss. *Kerbs*, ¶ 33. Although these tests are different, Sinclair satisfied them both.

Sinclair satisfied these tests in two ways. First, Sinclair began repairing the 583 unit as soon as it safely could, utilizing contractors already onsite and available to the extent possible.

---

[12] When evaluating tort damages, the Court still must take into account any fault on Sinclair's part. Wyo. Stat. Ann. § 1-1-109(b).

Sinclair then expedited the repairs in every reasonable way, which included instructing contractors to work overtime and expediting purchasing and shipping of essential and critical pieces of equipment and materials. Sinclair demanded safe construction from its vendors, but wasted no time in repairing the 583 unit to get it back into service and processing sour crude as quickly as possible.

Second, within twenty-four hours of the fire, Sinclair began planning to achieve partial production by taking the unprecedented act of operating its 581 Atmospheric Crude unit in "bypass mode." In bypass mode, Sinclair would operate the 581 unit, but instead of piping the "bottoms" material from the 581 unit to the inoperable 583 unit, Sinclair would "bypass" the 583 unit and instead pipe the atmospheric bottoms elsewhere. Even though the bypass would not recover full capacity, and even though it was wrought with unknowns and potential risks of failure, the evidence will show Sinclair made this mitigation effort its top priority in the days and weeks after the fire.

Operating in bypass mode is "exactly" what Pro-Inspect's own expert, Mr. Howell, would have done had he been in Sinclair's situation, and it is "exactly" what he expected Sinclair to do. And even though Sinclair was not ultimately successful in operating in "bypass mode," Sinclair and its consultants spent hundreds of man-hours preparing to run in this atypical mode. Sinclair's efforts show that it went above and beyond the reasonable efforts of an ordinary prudent man to minimize the losses it would suffer because of the burst pipe. Mr. Howell agrees that Sinclair's effort to operate in bypass mode was reasonable.

Despite efforts that both sides agree were reasonable, the bypass operation was unfortunately not successful. During startup of the atypical process, Sinclair's operator made a mistake that led to a small combustion event inside the 581 heater box.[13] This mistake, however, made while Sinclair was in the position of having to operate in atypical bypass mode because of Pro-Inspect's botched inspection, does not mean Sinclair failed to meet its burden to mitigate. To the contrary, cases routinely hold that reasonable effort, not success, is the claiming party's standard. *M & M Auto Outlet*, 2010 WY at ¶ 29.

---

[13] Sinclair did not include the costs of repairing the heater box in its claim.

## VI.    APPLICABLE LAW ON PRO-INSPECT'S DEFENSES

Because it cannot—and does not attempt to—defend Mr. Kiss's inadequate inspection, Pro-Inspect raised a variety of defenses to deflect from the real issues in this case. Pro-Inspect's defenses are based on either false legal premises or factual premises, or both.

### A.    Sinclair May Hold Pro-Inspect Liable Regardless of Sinclair's Regulatory Duties to OSHA.

Neither the applicable OSHA regulation, 29 C.F.R. § 1910.119, API 570, nor relevant common law preclude Sinclair from hiring Pro-Inspect to perform certain duties and holding it liable for its breach of contract and negligent conduct. First, the OSHA regulation allows Sinclair to hold Pro-Inspect liable. 29 C.F.R. § 1910.119(j)(4)(i), (ii). The regulation contains an entire subsection allowing employers like Sinclair to hire independent contractors like Pro-Inspect to provide inspections. *See* 29 C.F.R. § 1910.119(h). It carefully distinguishes between tasks the employer alone must complete and tasks that may be delegated to contractors. *Compare* 29 C.F.R. § 1910.119(j)(4)(iv) ("The employer shall document each inspection and test that has been performed on process equipment"), *with* 29 C.F.R. § 1910.119(j)(4)(i), (ii) ("Inspections and tests shall be performed on process equipment. Inspection and testing procedures shall follow recognized and generally accepted good engineering practices."). Nothing prevents Sinclair from holding Pro-Inspect liable for its own breach of contract and negligence, **not because Pro-Inspect owes a regulatory duty to OSHA like Sinclair, but because Pro-Inspect breached its contract and duty of care to Sinclair**. Sinclair hired Pro-Inspect to assist in its efforts to comply with OSHA regulations and Pro-Inspect impeded Sinclair from doing so. OSHA merely burdens Sinclair with regulatory obligations and holds Sinclair accountable if it fails to comply with its mandates.

API 570 expressly permits the utilization of authorized inspection agencies, such as Pro-Inspect, and allows Sinclair to hold Pro-Inspect liable for its breach of contract and negligent conduct. As previously noted, a contracting party may be held liable for its failure to comply with standards or guides incorporated into a contract. *See Winter*, 2010 WY at ¶ 16, 222 P.3d at 835-36. API 570 contemplates that an owner/user of a piping system, like a refinery, may hire an independent "authorized inspection agency" to provide API 570 inspection services. Inspection agencies provide "authorized piping inspectors" "qualified and certified to perform the functions specified in API 570" to refineries. API 570 § 3.1.7. As an owner/user, Sinclair concedes it has responsibilities under API 570 § 4.3 and other provisions. However, Sinclair's API 570

responsibilities do not absolve Pro-Inspect of any liability for its breach of contract or negligent performance of its API 570 responsibilities.

Finally, Sinclair may hold Pro-Inspect liable for its breach of contract and negligence under common law. "An independent contractor is responsible for its own negligence and that of its servants regardless of whether the law imputes to the contractor's employer liability for that negligence." 41 Am. Jur. 2d Independent Contractors § 61; *St. Paul Companies v. Constr. Mgmt. Co., Ltd.*, 96 F. Supp. 2d 1094, 1096-97 (D. Mont. 2000) (holding contractor liable in contract and tort for breach of "good and workmanlike manner" clause). Even in situations where an employer possesses a non-delegable duty to a third party, nothing supports Pro-Inspect's premise that the independent contractor "cannot be held liable for its own negligence." *See McGriff v. Gramercy Capital Corp.*, 2013 WL 1963801, * 4 n.6 (E.D. Va. May 9, 2013)[14]; *City of New Orleans, Through New Orleans Aviation Bd. v. Vicon, Inc.*, 529 F. Supp. 1234, 1243 (E.D. La. 1982) (holding failure to comply with industry standards and accompanying obligations renders contractor liable for damages suffered by the owner).

For example, if an individual hires a certified public accountant to help her comply with a regulatory duty imposed by the Internal Revenue Service to file and pay taxes, the taxpayer may hold the accountant liable in contract and tort for any professional malpractice even though the individual's regulatory duty to the IRS remains. *See Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 814-15 (10th Cir. 2013). The taxpayer cannot argue that the accountant possessed a duty to pay the employer's taxes—that responsibility remains with the taxpayer. Regardless, the accountant cannot avoid a malpractice claim just because the taxpayer retains her duty to pay taxes.

Pro-Inspect is liable to Sinclair because it breached its contract and acted negligently. By holding Pro-Inspect liable for its conduct, this Court reinforces a key Tenth Circuit principle: each party should be "responsible for its own activities and liable for loss and damage caused by its own failure to exercise reasonable care in its operations . . . ." *Hull v. Chevron U.S.A., Inc.*, 812 F.2d 590, 592 (10th Cir. 1987) (citing *Cities Serv. Co. v. Northern Prod. Co.*, 705 P.2d 321, 330 (Wyo. 1985)). Even though Sinclair retains regulatory responsibility to OSHA or may owe a duty in tort to a harmed third party, Sinclair may properly delegate tasks under API 570 to Pro-Inspect and hold it liable for breach of contract and negligence.

---

[14] Attached as Ex. 4.

**B.**      **Pro-Inspect's Status as an Independent Contractor and Certified Professional Defeats Its Arguments Regarding Sinclair's Alleged Lack of Oversight and Control.**

The Sinclair/Pro-Inspect contract provides that Pro-Inspect "is an independent contractor and, as such, has full power and authority to select the means, methods and manner of performing the Work, being responsible to [Sinclair] for all materials delivered and for the results contracted for." Under Wyoming law, this language determines Pro-Inspect's status as an independent contractor. *Natural Gas Processing v. Hull*, 886 P.2d at 1184 (citing *Noonan v. Texaco, Inc.*, 713 P.2d 160, 164-67 (Wyo. 1986)); *see also Hjelle v. Mid-State Consultants, Inc.*, 394 F.3d 873, 878 (10th Cir. 2005) (applying Wyoming law by looking to the contract's determination of independent contractor status first).

Even if this Court looks beyond the contract's explicit language, Wyoming law shows Pro-Inspect is an independent contractor. Wyoming considers factors including "the method of payment, the right to terminate the relationship without incurring liability, the furnishing of tools and equipment, the scope of work, and the control of the premises where the work is to be done." *Singer v. New Tech Eng'g L.P.*, 2010 WY 31, ¶ 9, 227 P.3d 305, 309-10 (Wyo. 2010) (citing *Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 21, 180 P.3d 895, 901-02 (Wyo. 2008)). Importantly, some control or influence by an employer will not negate a party's independent contractor status.

"The owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship." *Singer*, 2010 WY at ¶ 26 (citing *Franks v. Indep. Prod. Co., Inc.*, 2004 WY 97, ¶ 10, 96 P.3d 484, 490 (Wyo. 2004)); *see also Hjelle*, 394 F.3d at 878-79.

Sinclair and Pro-Inspect's relationship does not resemble an employer-employee relationship. Pro-Inspect furnished its inspectors' tools and equipment. Sinclair did not pay Mr. Kiss or other inspectors directly; Sinclair paid amounts due to Pro-Inspect, who cut checks to individual inspectors after withholding appropriate deductions. Although Pro-Inspect argues that morning meetings with Sinclair personnel and independent contractors constituted control, Mr. Eggleston only received inspectors' status reports and coordinated inspection efforts. These

19

activities plainly fall within an employer's general power of supervision as to the work's results. No evidence suggests Sinclair went beyond its general power of supervision over Pro-Inspect's inspectors to eliminate their independent contractor status.

Despite this relationship, Pro-Inspect invokes the borrowed servant rule as a defense—another attempt to avoid defending the inspection that Mr. Kiss performed. As a matter of law, this Court should reject the borrowed servant doctrine in this case. As Sinclair demonstrated in its Motion to Strike the Borrowed Servant Affirmative Defense, filed on March 26, 2014, this argument fails as a matter of law. *See* Dkt. 139.

### C. Pro-Inspect Remains Liable for Its Own Conduct Regardless of Sinclair's Alleged Failings.

Sinclair hired Pro-Inspect to inspect corroded pipe and reduce the risk of fires about which Pro-Inspect complains. Pro-Inspect essentially contends that the more a refinery needs Pro-Inspect's help, the less liable Pro-Inspect is for failing to give it. Pro-Inspect's arguments regarding Canadian Cold Lake crude, MaxiTrack, and Sinclair's review of the inspection data do not affect Pro-Inspect's liability for failing to comply with an authorized piping agency's API 570 obligations.

**Canadian Cold Lake Crude**. Sinclair's use of Canadian Cold Lake sour crude does not abrogate Pro-Inspect's liability. First, Pro-Inspect has no admissible evidence, and no expert designated to testify, that the amount and type of Cold Lake crude had any bearing whatsoever on Pro-Inspect's failed inspection. If required in rebuttal, Sinclair can present evidence rebutting the arguments—and that is all they are—about the sour crude's alleged corrosivity. This defense is a frolic and detour—Pro-Inspect was hired precisely because sour crude corrodes pipes and generates a market for inspection companies who are hired and paid to look for and find corroding pipes. Regardless the crude mix that Sinclair utilized, Pro-Inspect had a duty to inspect the piping, calculate the corrosion rates using Mr. Malave's UT measurements, and identify and report thin pipe. Sinclair paid millions to Pro-Inspect for its help in maintaining Sinclair's piping integrity. Sinclair's short-term purchases of Canadian sour crude are irrelevant to Pro-Inspect's failure as an authorized inspection agency, and a refinery cannot be comparatively at fault merely because it runs a business processing sour crudes.

**MaxiTrack**. Similarly, Sinclair's efforts to improve its mechanical integrity program without relying on the computerized MaxiTrack system does not change Pro-Inspect's liability. Sinclair instructed Pro-Inspect to use the CML form it provided, which required the API 570

inspector to calculate the corrosion rate and the number and locations of CML sites needed on each circuit by hand. Sinclair did not instruct Pro-Inspect to rely on MaxiTrack to calculate the corrosion rates because it did not want to delay the mechanical integrity project for which it hired Pro-Inspect. Sinclair will show at trial that Pro-Inspect knew the inspection data was not being entered into MaxiTrack and that Sinclair was not relying on MaxiTrack to calculate corrosion rates. Whether or not MaxiTrack was being utilized is irrelevant to whether Pro-Inspect properly complied with its API 570 responsibilities.

**Inspection Data.** Finally, Pro-Inspect remains liable for its failed inspection even though Sinclair did not review UT data until the fire. An authorized piping inspector is responsible for reviewing UT thickness data, and must do so to place CMLs and report any nonconformances to the owner-user. *See* API 570 §§ 4.3.4, 5.6.2, 5.5.3, 5.6.3. Sinclair assigned review of TechCorr's UT readings to Pro-Inspect. Pro-Inspect could not properly use the CML worksheet form without reviewing UT data. After Pro-Inspect completed the project, it placed 185 files in Mr. Fitzpatrick's office. Mr. Eggleston expected that Pro-Inspect would alert him to any problems or thin readings. The Code specifically requires such. API 570 4.3.4. Mr. Kiss should have reviewed the data and informed Sinclair of the thin pipe found. Pro-Inspect cannot escape its liability under API 570 by blaming Sinclair for failing to review the inspection data which the Code required Pro-Inspect to report to Sinclair.

## VII.   THE COURT'S COMBINED ANALYSIS

Although the analysis for Sinclair's tort and contract claims should yield the same amount of damages based on the particular facts of this case, the Court may find different tort and contract principles change the amount Pro-Inspect owes Sinclair. Therefore, the Court should follow a three-step process in awarding Sinclair damages. First, the Court must decide if Pro-Inspect breached the contract by applying the law and facts described above. If so, then the Court awards the direct damages and foreseeable consequential damages that will put Sinclair in the position it would have occupied had Pro-Inspect performed, using Wyoming's foreseeability test described above. But when fixing these damages, the Court does not consider Sinclair's comparative fault (if any).

Second, the Court will determine if Pro-Inspect acted negligently. Unlike the contract analysis, the Court will apply Wyoming's comparative fault statute. If Pro-Inspect was more negligent than Sinclair, then the Court awards Sinclair all damages proximately caused by Pro-

Inspect's breach, regardless of the damages' foreseeability. This amount is then reduced by any fault attributed to Sinclair and any other actor on the verdict form.

Finally, should the amounts for each theory differ, then the Court should award Sinclair the larger of the two amounts.

DATED March 31, 2014.

/s/ Patrick R. Day
Patrick R. Day, P.C.
Thomas L. Sansonetti, P.C.
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY 82003
Telephone: (307) 778-4200
Facsimile: (307) 778-8175
pday@hollandhart.com
tlsansonetti@hollandhart.com

Geraldine A. Brimmer
HOLLAND & HART LLP
1800 Broadway, Suite 300
Boulder, CO 80302
Telephone: (303) 473-2700
Facsimile: (303) 473-2720
gbrimmer@hollandhart.com

Buck S. Beltzer
Teresa D. Locke
HOLLAND & HART LLP
P. O. Box 8749
Denver, CO 80201-8749
Telephone: (303) 295-8000
Facsimile: (303) 295-8261
bsbeltzer@hollandhart.com
tlocke@hollandhart.com

Lynn C. Hart
Sinclair Oil Corporation
550 E. South Temple
Salt Lake City, UT 84102
Telephone: (801) 524-2756
Facsimile: (801) 524-2880
lhart@sinclairoil.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2014, I served a true and correct copy of the foregoing by CM-ECF addressed to the following:

Paul J. Hickey
David Evans
O'Kelley H. Pearson
HICKEY & EVANS, LLP
1800 Carey Ave., Suite 700
P. O. Drawer 467
Cheyenne, WY 82003-0467
phickey@hickeyevans.com
devans@hickeyevans.com
kpearson@hickeyevans.com

John J. Kenney
Jules R. Cattie, III
John P. Curley
HOGUET NEWMAN REGAL & KENNEY, LLP
10 East 40th Street
New York City, NY 10016
Telephone: (212) 689-8808
Facsimile: (212) 689-5101
jkenney@hnrklaw.com
jcattie@hnrklaw.com
jcurley@hnrklaw.com

/s/ Patrick R. Day

6745415_8

24